*15 ORDER
STACY L. LEEDS, Associate Justice.
Petitioner Mayes brings this lawsuit in his capacity as an individual member of the Cherokee Nation of Oklahoma,[1] against various officers and employees of the Nation in their individual capacities. This lawsuit arises out of various alleged improper actions taken in connection with the seating of Buel Anglen in the vacant Council seat for District 8.
On the 23rd day of September, 2002, this Court heard oral arguments on Respondents’ Motions to Dismiss. Petitioner Robin Mayes appeared in person and pro se. The Respondents Gina Blackfox, Buel Anglen, Barbara Starr Scott and Todd Hembree, appeared by and through attorney D. Michael McBride. Respondents Diane Hammons, Hastings Shade, Chadwick Smith and Julian Fite appeared by through attorney John Parris, substituting for Diane Hammons, attorney of record.
*16 At oral argument, the Court ordered the parties to submit expedited supplemental briefs to address questions posed by the Court with regard to Cherokee precedent. Specifically, the supplemental briefs were to address the cases Cornsilk v. Tribal Council (JAT-96-15) and Phillips v. Eagle (JAT 98-09) on the issue of standing.

Statement of the Case

Petitioner brings individual-capacity claims against officers and/or employees of the Nation arguing the officers and/or employees exceeded the scope of their authority in performing various improper acts during the process of filling a vacant Council seat. The petition alleges improper interference with the process of filling the vacancy and also questions the legality of the Council vote approving Buel Anglen as the new member of the Tribal Council for District 8. The Petitioner alleges that he, as a member of the Cherokee Nation of Oklahoma, has been denied the constitutional right of participation in the political process to select a new representative because the new representative was selected outside the legal criteria prescribed by legislative enactments passed pursuant to Article V, Section 2 of the Cherokee Constitution. Specifically, the petition alleges, among other irregularities, that the vote to seat Buel Anglen took place in a special meeting rather than in a regular council session as required by Legislative Act 8-02, to be codified as The Cherokee Nation Tribal Council Vacancy of Office Act (2002). .
The petition also alleges that the advertisement period for the vacancy was shorter than required by law and that Respondents ignored other qualified applicants in the inteiview process. The petition also alleges that the separation of powers set forth in the Cherokee Nation was violated by the actions of attorneys for the legislative and executive branches. Finally, it is alleged that members of the executive branch took inappropriate actions by becoming involved in the legislative process of filling the vacant seat.
The Petitioner seeks injunctive relief prohibiting respondents from further acting outside scope of their positions, declaratory relief voiding the improper actions in filling the vacant seat, injunctive relief prohibiting Anglen from participating in official business, and injunctive relief providing for proper appointment within a reasonable time. The only remedy sought against the Respondents in form of personal monetary damages are any costs the Court might assess.

Failure to State a Claim for Which Relief May Be Granted

Respondent Blackfox filed a Motion to Dismiss For Lack of Standing and Failure to State a Claim for Which Relief May Be Granted. Respondent correctly argues that Petitioner bases his claim against Blackfox on the issuance of a subpoena in JAT-02-15. Petitioner alleges Blackfox has gone outside the scope of her authority by hiring her own attorney to quash a subpoena. The only relief specifically requested in the petition is injunctive or declaratory relief (and perhaps court costs that might be imposed). Petitioner seeks no money damages or other specific relief from Blackfox.
The only way this Court could remedy the alleged wrong is by ordering Blackfox to comply with the subpoena or make a declaration that Blackfox lacked authority to protect herself from the subpoena by hiring an attorney and seeking to quash the subpoena. It is beyond the scope of the present case to rule on the validity of, or challenges to, subpoenas issued in JAT-02-15. Therefore, Petitioner fails to state *17 a claim for which relief may be granted, with respect to Respondent Blaekfox.[2]

Standing

Respondents Blaekfox, Anglen, Scott, and Hembree have filed a Motion to Dismiss for Lack of Standing asking this Court to dismiss this cause of action. Respondent’s Motion and oral arguments relied solely on Mayes v. Thompson with mention that Mayes has been modified by Phillips v. Eagle. The Court, concerned that both Phillips v. Eagle and Cornsilk v. Cherokee Nation,[3] had not been adequately addressed for their applicability to the present case or their value as Cherokee precedent, ordered additional briefing.
To promote predictability in future cases, the Court will attempt to clarify and reconcile the three cases, chronologically: Mayes v. Thompson, JAT-95-15, 1996 WL 1132748, 5 Okla. Trib. 117 (June 1996)(adopting the federal standing doctrine to deny standing to an individual tribal member); Cornsilk v. Cherokee Nation, JAT-96-15, 1996 WL 1132753, 5 Okla. Trib. 185 (Nov.l996)(permitting an individual tribal member standing to sue the Tribal Council); and Phillips v. Eagle, JAT-98-09, 1998 WL 34067261, 6 Okla. Trib. 454 (July 1998)(permitting a member of the Tribal Council standing to sue the Deputy Chief).
In Mayes v. Thompson, standing was an issue of first impression for the modem Cherokee judiciary. The Mayes Court addressed whether an individual tribal member has standing to challenge the manner in which appropriations bills are handled by the Tribal Council and the Executive Branch. The suit was brought against one Tribal Councilor and various employees of the Cherokee Nation seeking the following remedies: the removal oft he Tribal Councilor from office and the firing of various employees; a directive requiring the executive branch begin an investigation and file federal lawsuits; a directive requiring a ten year accounting of tribal funds; restitution to the tribe; and $10,000 money damages, attorneys fees and court costs to the Petitioner.
The Mayes Court, adopting the doctrine of standing as developed in the federal courts, held that Petitioner lacked standing. Applying the federal standing doctrine, which does not extend standing to individuals based solely on their citizenship status, the Court found the Petitioner did not meet the requisite “injury-in-fact.” That is, the Petitioner failed to adequately demonstrate how he was damaged or harmed by the actions of the Respondents. It is important to note that in Mayes, the Petitioner was seeking, among other remedies, money damages from the Nation arguing he was damaged by the manner in which the Nation handled certain financial matters.
In Mayes, the Court highlighted the similarities between the United States Constitution and of the Cherokee Constitution as reasoning for adopting the federal standing doctrine. Article II, Section 1 of the Cherokee Constitution reads:
The judicial process of the Cherokee Nation shall be open to every member of *18 the Cherokee Nation. Speedy and certain remedy shall be afforded under the terms of this Constitution for every wrong: and injury to person, property and reputation wherein said remedy does not conflict with the laws of the United States.
Article HI, Section 2 of the United States Constitution reads:
The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;—to all cases affecting ambassadors, other public ministers and consuls;—to all cases of admiralty and maritime jurisdiction;—to controversies to which the United States shall be a party;—to controversies between two or more states;—between a state and citizens of another state;— between citizens of different states;— between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.[4]
The federal standing doctrine, the Mayes Court noted, springs from the “case and Controversy” language found in Article III of the United State Constitution. The term “case” presupposes the litigants are real parties in interest and have been harmed by the parties they seek to recover. A party only has standing if that party has a legitimate stake in the. outcome of the controversy. Although the Cherokee Constitution does not contain the same “ease or controversy” language, the Mayes Court found the provisions similar enough to support a standing requirement in the Cherokee system. The Court reasoned that the “every wrong and injury” language in the Cherokee Constitution implies a requisite showing of “injury-in-fact” before a remedy can be sought.
Two years later, the Court’s decision in Phillips v. Eagle, expressly modified Mayes with respect to the applicability of the doctrine of standing as developed by federal courts. In Phillips, the Court held a member of the Tribal Council has standing, if not the duty, to seek injunctive and declaratory relief in challenging the actions of the Deputy Principal Chief in allegedly interfering with the operations of the Tribal Council. The Phillips Court cautioned, however, against the wholesale adoption of “a legal doctrine from the federal courts, based on federal law” into the Cherokee judiciary.
Agreeing with Mayes, the Phillips Court noted the sources found in Cherokee law for adopting the standing doctrine are “plausibly constitutional” (Art. II, § 1) as well as “prudent and practical” Of utmost importance to the Phillips Court was that the cause of action, initiated by a member of the Tribal Council in his official capacity, sought to protect against actions that impaired, or threatened to impair, the constitutional authority of the Tribal Council. On that premise, the Court modified Mayes strict adherence to the federal standing doctrine as follows:
In summary, while this Court generally follows the Federal Standing Doctrine, this Court will not allow the hyper-technical, federal complexities pertaining to standing prevail over a Just and expedi *19 tious resolution of a case on its merits. This Court will balance the guidance provided by federal and state court decisions in the interest of fundamental Justice, tempered by prudence, and guided both by the entirety of our Cherokee Constitution. The holding in Mayes, regarding standing, is therefore modified, accordingly.
The Phillips Court further noted that under this refinement, the Mayes decision would not have changed in terms of outcome, given this modification.
Mayes and Phillips read together, indicate that this Court will apply the standing doctrine, as developed in the federal system, as a guiding principle. This Court, does however, on a case-by-case basis, have the duty to balance the standing doctrine with concepts of fundamental fairness and justice as it is intended under the Cherokee Constitution and laws.
There is an additional case precedent to consider on the issue of standing in the Cherokee system, Cornsilk v. Cherokee Nation. Cornsilk, which was decided after Mayes but before Phillips, is similar in many respects to the present matter.[5] Unfortunately, although decided in the same year, Cornsilk is mysteriously silent as to Mayes. To complicate matters, Phillips is silent as to Cornsilk..
At issue in Cornsilk is whether an individual tribal member of the Cherokee Nation has standing to sue the Tribal Council to challenge the legislative process of filling a vacant Tribal Council seat. The Tribal Council filled the vacancy by majority vote in a meeting open to the public, but did so by secret ballot. Cornsilk, as an individual tribal member, filed action against the Tribal Council seeking injunc-tive relief prohibiting the new Councilor from being sworn into office. Other remedies requested were declaratory orders deeming the selection of the new Councilor invalid, and declaring the use of secret ballots by the Tribal Council violated the Cherokee Nation Constitution, Article V, Section 6.
The Court resolved the standing issue in Cornsilk’s favor with little discussion of the standing doctrine. The Cornsilk Court’s only pronouncement on standing follows:
Insomuch as Cornsilk, like any individual citizen of the Cherokee Nation, has a vested Constitutional right to know how each Council Member votes on legislative issues, he has legal standing to complain when such rights are violated. Therefore, he has a personal stake in the outcome of this case, and can maintain the action.
The vested constitutional right in Cornsilk flows from Article V, Section 6 which requires, with certain exception, “all meetings of the Council and of its committees shall be open to the public” and that if a vote should take place in an Executive Session “the vote shall take place in an open meeting.” The Court reasoned that there was “little choice but to logically conclude” that the Council is required “not only to vote in public, but to vote in a way in which citizens of the Cherokee Nation can ascertain how each Councilor voted.” The Court noted that Cornsilk would indeed lack jurisdiction to request the removal of Council members. However, the remedy requested was that the Court declare invalid, the process in which the Council member was selected.
The Cornsilk Court’s decision, following by a mere five months the Mayes decision *20 did not address the five factors articulated in Mayes and urged to restrain the Court In the present manner. As a result, the Court permitted David Cornsilk, acting only as an individual tribal member, standing to sue the Tribal Council, Petitioner Mayes, in the present cause of action, alleges violation of the legislative process by which a new Council member was selected. Like Cornsilk, he is not asking the Court to remove Anglen. He has asking the Court to declare invalid the process in which Anglen was selected.
Petitioner alleges that the legislatively mandated process for filling the seat was not followed and further, he alleges that Respondents' individual conduct impeded that process. Specifically, Petitioner argues that his rights, and the rights of all Cherokee citizens were violated when LA-602, legislation passed pursuant to Cherokee Constitution. Article V, Section 2 states: “The Council shall establish its rules for its credentials, decorum and procedure.” Implicit in Article V, Section 2 of the Cherokee Constitution is the duty of the Council to follow and faithfully implement the rules and procedures it enacts under that Constitutional authority. Petitioner alleges this has not been done, and as a result, he and all tribal members have suffered Injury.
Petitioner does not allege a minor violation of a trivial legislative procedure. Petitioner alleges that the Tribal Council violated its own laws that strictly dictate the process for filling a vacant Council seat and that the actions of those named as Respondents further caused the process to fail. If a Tribal Council member was, in fact, seated in violation of a the laws passed under authority of the Cherokee Constitution, all members of the Cherokee Nation suffer direct harm and there must be an adequate means to remedy that injury. This is one of those rare instances, as foreshadowed in Phillips, where the procedural frustration of the federal standing doctrine should be counter-balanced to allow a just and expeditious determination! on the merits. For this reason, the Court denies Respondents Motion to Dismiss for Lack of Standing.
The practical concerns articulated in Mayes under the federal standing doctrine continue to concern this Court- The Court does not intend the recognition of citizens’ standing to have no boundaries. To the contrary, the Court deems the instances of citizen standing to be quite narrow. The Court is cognitive of the potential for the abuse of judicial process by those “seeking to, or simply seeking a public arena to express their political views.”
It should be noted that both Cornsilk and the present ease are limited to allegations of illegality and irregularity in the process of filling Tribal Council vacancies. Both instances involve alleged violations of specific constitutional provisions or specific legislative mandates that are passed pursuant to the Constitution. Both instances call into question the right of the Cherokee people to question the process by which their Tribal Council members are seated.
At oral argument, the Court asked Respondent to dictate under what circumstances a member of the Cherokee Nation would have standing to challenge the process in which a Tribal Council seat was filled. Respondents’ attorney indicated that even if Petitioner was a resident of District 8, which he is not, the same standing doctrine as articulated in Mayes should apply to bar litigation. It is argued that even if the Petitioner was a resident of District 8, standing should be denied because tribal member should not have standing by virtue of their citizenship alone. The Court agrees that there can be no distinction based on residence in District 8, for to do so would undermine the *21 rights oí ever tribal member residing outside the territorial boundaries of the Cherokee Nation.
The Cherokee Constitution, by virtue of the Article III membership provisions, extends membership to individuals regardless of where they reside. The election provision of Article IX extends voting rights to adult tribal members with no residential requirement to live within the fourteen county territorial jurisdiction of the Nation. To make a residential distinction for purposes of standing would be inconsistent.

Individual Capacity Claims

Petitioner brings this suit against Respondents in their individual capacities. Respondents Hammons, Shade, Fite and Smith filed a Motion to Dismiss noting that Petitioner seeks unnamed relief against Respondents in their individual capacities. Respondents argue that, official action, even if it is wrong, is the action of the sovereign. Petitioner alleges that Respondents exceeded the scope of their authority under Cherokee law and committed acts which they were not authorized to do. As such, he urges, they should be held individually liable for their actions.
Although there is no discussion in Cherokee case law, in federal cases, “individual” capacity claims are easily distinguishable from “official” capacity suits based on the remedy sought by the Petitioner. In Hafer v. Melo, 502 U.S, 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), the distinction is made by the United States Supreme Court. “Personal” or “Individual” capacity suits are those brought against the individual who was acting under the color or authority of law. “Official” capacity suits, on the other hand, are merely another way of suing the particular government, of which the official is merely an agent. It can be ascertained from the remedies sought, which type ot action is truly at hand.
The proper question for this Court, in distinguishing whether a particular Respondent is sued in an individual or official capacity is the nature of the relief sought, not the nature of the act or omission alleged. If the Petitioner seeks an injunction requiring the Respondents to take an action involving the exercise of a governmental power, the Respondent is named in an official capacity. If the former, it is an official-capacity claim; if the latter, it is an individual-capacity claim; and if it is both, then the claims proceed in both capacities.
In the present case Respondents, when they allegedly obstructed or otherwise failed to follow the appropriate process for filling the vacant Tribal Council seat, were acting in their official capacities as Tribal Council members, Executive Branch members and/or employees of the Nation and this is evident from the relief requested by the Petitioner. Petitioner does not seek damages or individual relief from any particular Respondent, rather he is seeking injunctive and declaratory relief that could only be followed by Respondents in their official capacities.
The Petitioner requests injunctive relief “prohibiting Respondents from acting outside the scope of their position and illegally impacting imbalance of powers in the three branches of government.” The Petitioner also requests “declaratory relief finding the June 28, 2002 Cherokee Nation of Oklahoma Tribal Council action filling the vacancy in District # 8 void” and “immediate injunctive relief which prohibits any effort to allow official participation of Respondent Anglen in the business of the Cherokee Nation of Oklahoma.” Further, Petitioner asks for injunctive relief “providing for and requiring a proper appointment within a reasonable time limit.” The *22 only other relief requested is that Respondents be held personally accountable for the costs, presumably monetary court costs, that result from Respondents actions.
Reviewing the relief requested one-by-one, the Court sees no relief, with exception of perhaps court costs, that could be directed at the Respondents in anything but their official capacities. If this Court entered injunctive relief prohibiting Respondents from acting outside the scope of their authority, the Court would be ordering nothing more than to order tribal officials and tribal employees to abide by their oaths and job descriptions. If this Court granted injunctive relief that voided the Council vote, the relief would bind the Tribal Council as an official entity of the Nation, not as individuals. In short, this Court is asked to order the Nation to do certain things to correct a breach of process. There is simply no requested relief the Court could order an individual Respondent to do that would remedy the injury alleged in the Petition. With respect to individual claims, Respondents’ Motion to Dismiss is hereby granted, in part, by the dismissal of Respondents in their sing the individual capacities. The Court does not, however, dismiss the cause of action entirely.
Federal courts routinely construe pro se complaints liberally in these types of cases to read the petition as against Respondents in both their official and individual capacities based on the type, of relief sought.[6] This occurs in cases where the capacity is unspecified and in cases where, based on the relief sought, there are cognizable claims that the complaint does not properly assign as “individuar or “offi-cia!.” Because the Cherokee judiciary allows non-attorney pro se litigants, the Cherokee construction should be as liberal as the federal standard.
In this case, the Court will exercise the discretion to treat Petitioner’s pro se complaint as attempting to bring claims against all Respondents both in their official and individual capacities. After hereby dismissing the individual capacity claims against Respondents Hammons, Fite, Shade and Smith, the official capacity claims, seeking prospective injunctive relief remain. As to the additional Respondents, there is no motion properly before the Court seeking dismissal of individual claims.

Summary

As set forth herein, THE COURT DENIES Respondents’ Motion to Dismiss for Lack of Standing. THE COURT GRANTS Respondent Blackfox’s Motion to Dismiss for Failure to State a Claim. FUTHER, THE COURT GRANTS IN PART, DENIES IN PART, the Motion to Dismiss of Respondents Hammons, Fite, Shade and Smith.
IT IS THEREFORE ORDERED that the style of the case shall remain as against Respondents Hammons, Fite, Shade, and Smith in their official capacities only; and against Anglen, Starr-Scott, and Hembree in both their official and individual capacities.
IT IS SO ORDERED.

. The style ot the case lists Petitioner Mayes "in his official capacity as the Principal Chief of the United Cherokee Nation." Nothing in the petition elaborates further as to this title, nor does the petition allege an injury to this "official” capacity. Therefore, this order addresses Petitioner’s claims as an "member of the Gherokee Nation of Oklahoma.”

. Of the Motions to Dismiss properly before this Court, Respondent Blaekfox is the only Respondent to argue dismissal for failure to state a claim. As Such, the-ruling-is limited to Blaekfox.

. Neither party cited Comsilk in the original briefs. The Court asked each party, at oral argument, to compare and distinguish the case in light of the present matter. Respondent attorney Michael McBride requested an opportunity to provide supplemental briefing and the Court granted his oral motion. Providing both parties expedited briefing.

. Art. Ill of the U.S. Constitution, it should well be remembered, denied the Cherokee Nation access to federal. courts to challenge an assault on Cherokee sovereignty at the hands of the State of the of Georgia. Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831). The following year, a non-Indian missionary was permitted access to federal court to argue the merits of the Cherokee Nation's claims. Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832).

. The cases are similar in that they challenge the process by which a vacant Tribal Council seat is filled. It should be noted, however, that LA 08-02, the legislation that presently mandates vacancies was not in existence at the time ComsiIk was filed.

. Innumerable federal cases employ this approach when reviewing complaints of non-attorney pro se litigants. The cases uniformly consider the suit to be brought in both individual and official capacity regardless of what the petition states. See e.g. Fenner v. Suthers, 194 F.Supp.2d 1146 (D.Colo 2002).